# IN THE COURT OF APPEALS OF IOWA

————————

No. 25-0432
Filed April 1, 2026

————————

**State of Iowa,**
Plaintiff–Appellee,

v.

**Kimberly Anne Hammond,**
Defendant–Appellant.

————————

Appeal from the Iowa District Court for Clinton County,
The Honorable Joel W. Barrows, Judge.

————————

**AFFIRMED**

————————

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, attorneys for appellee.

————————

Considered without oral argument
by Buller, P.J., Sandy, J., and Bower, S.J.
Opinion by Buller, P.J. Special concurrence by Sandy, J.

1

**BULLER, Presiding Judge.**

Kimberly Hammond shot and killed her affair partner, Randy Weimerskirch, following a dispute over a drug debt. She appeals her convictions for first-degree murder and first-degree robbery, alleging evidentiary errors related to exclusion of her proposed toxicology expert and the admission of certain photos into evidence. We affirm.

## BACKGROUND FACTS AND PROCEEDINGS

In the week leading up to New Year's Day of 2023, Hammond texted Weimerskirch that she was angry about their relationship and upset Weimerskirch hadn't repaid a drug debt he owed her.[1] Hammond demanded Weimerskirch give her the money, and she heard from friends that he planned to not repay her.

Hammond spent New Year's Eve with her boyfriend Donivan Chambers; they had been dating for about eight months and talked about getting engaged. Chambers recalled that he and Hammond got a Baja Blast at Taco Bell that day, went back to Hammond's apartment, had sex, did drugs, and drank alcohol. Late that evening, Chambers overheard a phone call between Hammond and Weimerskirch in which Hammond expressed she was upset about the money Weimerskirch owed her. When she hung up the phone, Hammond told Chambers she "wanted to kill" Weimerskirch; Chambers told her he didn't think it was "worth it." Hammond then asked Chambers if she could borrow his gun—a .357 Magnum revolver—and he again told her "killing somebody over money" wasn't worth it, especially when the debt was only around $200. When Chambers wouldn't hand over

---

[1] The exact content of the text messages was not admitted into evidence but a summary was—without objection to its paraphrase of the messages.

the gun, they argued. Chambers left the gun in the bedroom and the two left to pick up their friend Justice Foley and give her a ride home from the bars. In Chambers's recollection, Hammond took a long time to get ready, and they left the house separately, with Hammond going back inside to retrieve something—Chambers thought at the time cigarettes.

Hammond drove herself and Chambers to pick up Foley and her boyfriend. Hammond then drove the four to Weimerskirch's apartment. They parked, and Foley and Hammond went up to the door. Chambers was playing on his cell phone in the car and wasn't paying attention; he was surprised when Hammond and Foley came back to the car, and—in Chambers's words—Hammond "started saying 'I shot him' and went to hand [Chambers his] gun back after she said she shot him." Chambers inspected the gun and found a spent casing in the chamber, indicating the gun had been fired once.

Hammond "panicked" and drove them back to her place, where she and Foley showered and washed their clothes. Chambers threw the spent casing into the storm drain, in his words "to protect [his] ass and [Hammond's]." Around this time, Hammond confessed to Chambers that "she kind of liked" shooting Weimerskirch. By trial, Chambers had been charged with accessory after the fact and was facing two years in prison; he did not have any plea agreement regarding his testimony.

Foley, who did enter into a proffer and cooperation agreement with the prosecution, filled in the gaps of what happened at the door to Weimerskirch's apartment. According to Foley, they went there because Hammond said she needed to get money from Weimerskirch and she needed Foley's help to do it. She said that Hammond "flashed" the gun as they approached the door and said: "We got this." They walked up to the

apartment, "knocked" and "pound[ed]" on the door, then identified themselves, and Weimerskirch told them to "fuck off" and leave. Eventually the door started "giving way" from their battering, and Weimerskirch opened the door about halfway. According to Foley, Hammond shot Weimerskirch "as soon as [the door] opened," "pretty much instantaneous[ly]." He was holding a baseball bat but never raised it, never tried to strike Foley or Hammond, and never left the apartment. Despite being evasive during initial police questioning, Foley eventually disclosed the events of the night to an agent with the Division of Criminal Investigation (DCI), to whom she remarked: "It sounds like a fucking murder."

Unbeknownst to Foley or Hammond, Weimerskirch's friend Darcy Steffen spent the evening with him at the apartment; they had run some errands that day and baked brownies when they got home. Steffen corroborated the phone call described by Chambers from what she overheard on her end. After the call, Weimerskirch said to Steffen: "Somebody's been running their mouth to Kim." And about twenty minutes after that, Steffen heard Hammond and Foley "pounding" on the front door. She also described Weimerskirch holding a baseball bat but never raising it. And in her words, "As soon as the door flung open, [Weimerskirch] just dropped right away. He just got shot in the head." She believed the shot was fired the "instant" Weimerskirch opened the door. And she identified "Kim" as the shooter.

First responders found Weimerskirch on the ground, bleeding from his skull and with agonal breathing. He was pronounced dead at the hospital. The state medical examiner eventually concluded the cause of death was a gunshot wound to the head and the manner of death was homicide.

4

According to the forensic evidence, the fatal shot was fired from at least eighteen inches away.

Once Hammond and Foley showered and changed back at Hammond's apartment, the group got back into the car—Hammond again driving—and left with the plan of selling the gun to get rid of it. In Chambers's words, the group was soon "lit up by a squad car" and a traffic stop ensued. Unbeknownst to Hammond's group, police had linked the "Kim" identified as the shooter to Hammond based on notes at Weimerskirch's apartment. Officers patted down Chambers, and he handed over the .357 Magnum without incident. To make a long story short, Chambers was dishonest with police until he learned Weimerskirch had died, at which point he started "being forthcoming."

Like Foley and Chambers, Hammond was also not consistently honest with police. She confessed to the traffic-stop officers that she had been having an affair with Weimerskirch and that Chambers did not know. And she admitted to discussing the debt with Weimerskirch on the phone. But she claimed she been home all day and was just headed to visit her sister—even though the traffic stop happened around 4:30 a.m. She also said she had not seen Weimerskirch in person since Christmas Eve.

Hours later, when interviewed by a DCI agent, Hammond again admitted to the affair and the debt. But when the DCI agent said she had evidence Hammond was at the apartment, Hammond changed her story and admitted to being there. In this version of events, Hammond claimed she and Foley never went up to the door. Then she admitted she and Foley knocked on the door but said they left when Weimerskirch told them to leave. Then Hammond told a fourth story, in which she said Foley shot Weimerskirch in self-defense. Finally, she told a fifth story, in which she admitted she was the

one who shot Weimerskirch—though she still claimed it was justified, now because Weimerskirch allegedly hit Foley with a baseball bat. In addition to these broadly irreconcilable versions of events, Hammond also made inconsistent statements about whether Foley fell down because of the alleged attack and about whether Chambers knew she had the gun. When the DCI agent eventually told Hammond that Weimerskirch had died, Hammond responded: "I'm going to jail for the rest of my life."

Inconsistent evidence was presented at trial about whether Hammond was familiar with firearms. At one point, she told the DCI she "didn't know anything about guns and had not shot any . . . firearms." But, under questioning from defense counsel, Chambers testified that Hammond had previously "showed [him] a video of her shooting a gun." Two photos extracted from Hammond's phone depicted her nude with a handgun: one showed her pointing the gun as if to shoot it and in the other she is kissing the muzzle. Stickers were placed over an exposed nipple and genitalia in the version of the photos presented to the jury.

A jury found Hammond guilty as charged of murder in the first degree, a class "A" felony in violation of Iowa Code sections 707.1 and 707.2(1)(a) and (b) (2022), and robbery in the first degree, a class "B" felony in violation of sections 711.1 and 711.2. The district court sentenced her to life in prison without parole for the murder and a consecutive term of twenty-five years on the robbery. She appeals, challenging two evidentiary rulings.

## STANDARD OF REVIEW

We review evidentiary challenges for an abuse of discretion. *State v. Elliott*, 806 N.W.2d 660, 667 (Iowa 2011). Particular to objections under Iowa Rule of Evidence 5.403, "we give a great deal of leeway to the trial judge who

must make this judgment call" because "the weighing of probative value against probable prejudice is not an exact science." *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006).

## DISCUSSION

Hammond claims the district court abused its discretion in two ways: (1) excluding proposed testimony from a toxicologist intended to comment on whether methamphetamine found in Weimerskirch's body at autopsy could have made him violent the night of the murder; and (2) admitting photos recovered from her cell phone depicting her holding a handgun while nude. We consider each.

### I. Generalized Toxicology Testimony

Hammond first asserts error in the district court's exclusion of her proposed toxicology expert, from whom she intended to elicit generalized testimony that persons who consume methamphetamine can be violent, ostensibly in support of a self-defense claim based on methamphetamine found in Weimerskirch's body at the time of autopsy. But before we assess the merits, the parties' appellate filings require a detour to address the scope of the record on appeal.

The rules of appellate procedure are clear: Only documents filed in the district court are part of the record on appeal. Iowa R. App. P. 6.801. And the case law is similarly explicit that we only consider materials before the district court when reviewing that court's decisions. *See Alvarez v. IBP, Inc.*, 696 N.W.2d 1, 3 (Iowa 2005). We are thus displeased with both parties' attempt to inject outside-the-record material into the briefing. Specifically, we disapprove of counsel for the appellant's attempt to argue unadmitted "medical treatises" as the basis for factual arguments. We similarly

7

disapprove of the State's responsive argument citing a journal article to speculate as to certain drug-test results. And we disapprove of the six internet-website and other outside-the-record sources that appear in the appellant's reply brief, again offered for the purpose of arguing various disputed factual questions. Appellate courts do not exist to decide factual questions for the first time on appeal. We disregard all these outside-the-record materials and reiterate our frustration with parties willfully violating the rules of appellate procedure.

The record actually developed below concerns a toxicologist with a bachelor's degree in biochemistry and a master's degree in "forensic science and law." She was not a psychologist or physician and had not authored any studies or literature concerning methamphetamine use specifically. She agreed there was "no correlation" between the level of methamphetamine in a person's body and their behavior, contrasting that with expectations regarding alcohol consumption. And she said she could testify "generally" to the impact methamphetamine could have on a person but could not "specifically" testify as to its impact on Weimerskirch. These voir-dire exchanges are illustrative:

> Q. Do you have any idea what specifically Randy Weimerskirch, the sample that you tested, how he would have behaved if he would have consumed methamphetamine? A. Not specifically for him, no, just generally what methamphetamine could have—what results could have happened. Or behaviors, I should say.
>
> . . . .
>
> Q. You cannot opine how the methamphetamine had impacted Randy Weimerskirch, correct? A. Not at an individual level, no.
>
> . . . .
>
> Q. You can't say how those drugs would have affected his behavior at all after he took the drugs, correct? A. Not specifically.

Q. And you certainly wouldn't be able to talk about how his behavior would have been impacted by the drugs at the time that he was shot, correct?  A. I would not.

As a general observation, the toxicologist noted that the spectrum of human behavior on methamphetamine is wide, ranging from passive to aggressive, and depends in part on a person's history of using and tolerance to the substance.

The district court, relying in part in on our unpublished decision in *State v. Landrum*, No. 21-1351, 2023 WL 6619463, at *3–4 (Iowa Ct. App. Oct. 11, 2023), excluded the toxicologist's testimony as irrelevant and substantially more unfairly prejudicial than probative. The district court emphasized that there was "essentially nothing" in the record establishing aggression by Weimerskirch, and significant evidence "to the contrary" showing he did not raise the bat. And the court observed that admitting generalized testimony about methamphetamine use "would really do nothing other than invite speculation, and there is a great risk it could instill a prejudice against the alleged victim in this jury based on the drug use." We agree entirely with the district court's reasoning.

In *Landrum*, this court affirmed the exclusion of similar evidence when the medical examiner testified that drug consumption "could" have affected the victim, reasoning any relevance was minimal and the risk of unfair prejudice high. 2023 WL 6619463, at *3–4. We emphasized the lack of evidence linking generalized information about drug use to a particular person's behavior on the drug and the generalized information's "marginal probative value." *Id.* at *4 (citation omitted). We have also observed that "[a] person's use of illegal drugs is the type of highly prejudicial evidence that should be excluded." *State v. Leslie*, No. 12-1335, 2014 WL 70259, at *5 (Iowa Ct. App. Jan. 9, 2014). And these conclusions track our other unpublished

decisions. *See State v. Hunter*, No. 21-1325, 2022 WL 10827449, at \*7 (Iowa Ct. App. Oct. 19, 2022); *State v. Hutchins*, No. 15-0544, 2016 WL 4051601, at \*6 (Iowa Ct. App. July 27, 2016). All of these considerations support affirming the district court. At bottom, Hammond failed to link generalized toxicological testimony to the specific facts of this case, and absent that link the district court reasonably exercised its discretion to exclude the evidence. And while there certainly was evidence that Hammond, Weimerskirch, and others in the case used drugs, the argument that Weimerskirch's drug use directly or indirectly justified killing him is a horse of a different color with heightened risk of prejudice. And last, to the extent Hammond urges we should overrule or disavow *Landrum*, we decline to do so and instead reaffirm that it correctly stated the law and provides useful guidance to district courts, including the court below here.

## II.     Photos of Hammond with Handguns

Hammond next argues the district court abused its discretion when it admitted two partially redacted photos of her handling firearms while nude.[2] The State on appeal argues Hammond opened the door to this evidence by eliciting statements about her familiarity with firearms and that it was independently relevant to address her inconsistent statements about her

---

[2] Hammond's argument on appeal has drifted a bit from her argument in the district court. Below, Hammond's primary argument for excluding this evidence was that the photos improperly impeached her "without her actually having testified"; as her attorney put it, "I don't think they can come in unless she actually . . . testifies." It appears that argument has been abandoned on appeal in favor of a more generalized relevance and more-prejudicial-than-probative objection. *See* Iowa Rs. Evid. 5.401, 5.402, 5.403. We assume without deciding that these broader objections were minimally preserved, though we are somewhat skeptical the district court expressly ruled on them separate from the impeachment argument.

familiarity with firearms. And the State urges that any danger of unfair prejudice did not substantially outweigh this probative value.

We discern no abuse of discretion by the district court. Hammond's inconsistent statements about her knowledge of firearms and her eliciting testimony from Chambers about her handling guns placed this fact in dispute sufficient to warrant admission of the photos. But even if the defense had not opened the door, whether Hammond was familiar with firearms was probative on the State's burden to prove that Hammond intentionally shot Weimerskirch for premeditated murder—in other words, that she did not shoot him accidentally. *See State v. Hofer*, 28 N.W.2d 475, 483 (Iowa 1947) (equating "willful" under the predecessor first-degree murder statute with "not accidental"). Familiarity with firearms is fundamentally relevant to assessing the question of intent versus accident. And we are not persuaded that the differences between handguns and revolvers render the familiarity with one irrelevant to use of the other. In short, we agree with the district court that the photos crossed the low threshold for relevance under the rules of evidence. *See State v. Thoren*, 970 N.W.2d 611, 622 (Iowa 2022).

As to the danger of unfair prejudice, we do not think the photos are nearly as inflammatory as many of the callous inculpatory statements made by Hammond to Chambers, Foley, and the police. And the State covered up Hammond's exposed nipple and genitalia, at least partially mitigating the risqué nature of the photos. We discern no substantial risk the jury convicted Hammond based on shock over the photos, given the other record evidence. *Cf. State v. Putman*, 848 N.W.2d 1, 14–15 (Iowa 2014) (affirming admission of evidence the defendant conducted explicit searches for child pornography depicting infants in case where he was accused of sexually abusing an infant). Because we do not believe the risk of unfair prejudice substantially

outweighed the photos' probative value, and we find them relevant to the State's burden, we affirm the district court.

Last, even if we thought the admissibility was a closer call, we would find any error in the admission of the photos harmless given the overwhelming evidence of Hammond's guilt. As our lengthy rendition of the facts demonstrates, Hammond's own admissions, her conduct demonstrating consciousness of guilt, the eyewitness testimony, and the powerful motive evidence—sex, drugs, and money—all paint a compelling portrait of Hammond's guilt for first-degree murder and robbery. We are confident that the jury did not convict based on the photos rather than evidence of factual guilt. And so, even if the photos should have been excluded, that error is no basis for reversal.

**AFFIRMED.**

Bower, S.J., concurs; Sandy, J., specially concurs.

**SANDY, Judge** (specially concurring).

I join the court's opinion but write separately to emphasize the narrowness of the evidentiary ruling. Our case law establishes that expert testimony regarding physiological effects from drug use is admissible when grounded in scientific evidence and meaningfully tied to the specific facts of the case. This is particularly true where the expert can connect the substance at issue to the individual's actual conduct as reflected in the record. But we do not have that here.

For example, in *State v. Stendrup*, the Iowa Supreme Court addressed the admissibility and scope of forensic expert testimony concerning the physiological effects of methamphetamine on a victim during an assault. 983 N.W.2d 231, 240–41 (Iowa 2022). The court held such testimony was properly admitted since the testimony was grounded in medical and scientific evidence and tied to the specific facts of the case, including to the victim's condition and the circumstances of the assault. *Id.*

And in *State v. Sanchez-Casco*, we upheld the admission of expert testimony on intoxication where a law enforcement officer's opinion was based on training, experience, and direct observations of the defendant's behavior. No. 17-1833, 2018 WL 6132282, at *3 (Iowa Ct. App. Nov. 21, 2018) ("A qualified expert 'may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.'").

On this record, there were few if any specific facts proving aggression by the victim that would anchor the proffered toxicological testimony to the victim's behavior. Without more of a factual link, the district court acted within its discretion in excluding the evidence. I would view the matter

differently, however, if the record contained case-specific evidence of the victim's aggressive behavior. In that circumstance, expert testimony bearing on the effects of the substances identified could materially assist the factfinder and alter the admissibility analysis. The absence of such a factual foundation is what proves dispositive here.